CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

OCT 1 5 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| C.B. FLEET COMPANY, INC., *Plaintiff,* | CASE NO. 6:09-cv-00062 |
| v. | <u>MEMORANDUM OPINION</u> |
| ASPEN INSURANCE UK LIMITED, and ASPEN UNDERWRITING SYNDICATE 4711 AT LLOYD'S LONDON, *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the Court upon the Motion to Stay Proceedings Pending Arbitration filed by Defendants Aspen Insurance UK Limited ("Aspen Insurance") and Aspen Underwriting Syndicate 4711 at Lloyd's, London ("Aspen Underwriting") (collectively "Aspen") on November 24, 2009 (docket no. 2), Plaintiff C.B. Fleet Company, Inc.'s ("Fleet") Opposition to Defendant's Motion to Stay Proceedings Pending Arbitration, filed on January 19, 2010 (docket no. 35) and Aspen's Reply Memorandum in Support of Defendants' Motion to Stay Proceedings Pending Arbitration, filed on January 26, 2010 (docket no. 36).

After full consideration of the arguments set forth therein and presented at the hearing, for the reasons set forth in this Memorandum Opinion, the Court granted Aspen's Motion to Stay Proceedings Pending Arbitration, as to Aspen Insurance and Aspen Underwriting, in an Order dated September 30, 2010 (docket no. 42).

## I. BACKGROUND

This case arises from the issuance of two insurance contracts: one concluded between Fleet and Aspen Insurance, identified by contract no. K0A076H08A0F ("Aspen Insurance Binder"), and the other concluded between Fleet and Aspen Underwriting, identified by contract no. B0509/DL519408 ("Aspen Underwriting Binder") (collectively "the Binders" or "the Aspen Binders"). Both relate to the period between August 1, 2008 and July 31, 2009. On the merits, Fleet seeks a declaratory judgment that the Binders obligated Aspen to provide Fleet with insurance policies and coverage for certain claims, *see* Complaint, at ¶ 1 (docket no. 1, ex. A), while Aspen argues, *inter alia*, that Fleet made material misrepresentations when procuring the Binders, and consequently seeks to have them rescinded, *see* Defendant's Demurrer, Answer, Affirmative Defenses, Counterclaim, and Jury Demand, at ¶¶ 33-35 (docket no. 1, ex. B). However, before the Court is the narrow question of whether the dispute between the parties is covered by an arbitration agreement, warranting a stay of litigation pending the completion of arbitration proceedings between Aspen Insurance and Fleet.

Fleet is a Virginia corporation that was engaged in the production and sale of oral sodium phosphate products ("OSPs"), which were intended for bowel-cleansing prior to colonoscopy or other procedures. On December 11, 2008, the United States Food and Drug Administration ("FDA") issued a safety alert regarding OSPs, "includ[ing] the prescription products, Visicol and OsmoPrep, and OSPs available over-the-counter without a prescription as laxatives (e.g., Fleet Phospho-soda)." Fleet's Opposition to Motion to Stay, ex. A. The FDA issued this safety alert due to reports of acute phosphate nephropathy, which is "a form of acute kidney injury that is associated with deposits of calcium-phosphate crystals in the renal tubes that may result in permanent renal function impairment," in connection with the use of OSPs. *Id.* Fleet alleges that it immediately recalled its

oral Phospho-soda products, however approximately one thousand personal injury claims were subsequently filed against Fleet stemming from the use of its Phospho-soda products. *See* Fleet's Opposition to Motion to Stay, at 3.

Fleet structured multiple layers of insurance to provide liability coverage for claims arising out of Fleet's Phospho-soda products. *See* Complaint, at ¶ 9; *see also* Fleet's Opposition to Motion to Stay, at 3. The primary insurance policy in this structure was issued by CNA. *See* Complaint, at ¶ 9; *see also* Fleet's Opposition to Motion to Stay, at 3. Generally speaking, in such a multi-layer insurance arrangement, any insurer that issued a policy in "excess" of the primary policy would only become liable after the primary insurer's coverage, as well as that of any underlying excess insurers, was exhausted. *See Am. Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d 76, 77 (2d Cir. 1993).

The principal disagreement between the parties concerns the interpretation of the Aspen Insurance Binder, which provides for excess layer insurance with liability limits of $15,000,000 excess of $85,000,000. *See* Aspen Insurance Binder, at 1 (docket no. 4, ex. 5). Swiss Re is the excess layer insurer immediately underlying Aspen Insurance, with liability limits of $25,000,000 excess of $60,000,000. *See* Aspen's Memorandum in Support of Motion to Stay, at 3; Fleet's Opposition to Motion to Stay, at 4. The question before the Court is whether the parties agreed to arbitrate their disputes relating to the Aspen Insurance Binder. Aspen argues that the Aspen Insurance Binder is subject to a written arbitration agreement expressly incorporated therein, because the Binder provided it would "follow form" to the Swiss Re policy wording, which includes its arbitration clause requiring the arbitration of "[a]ny dispute, controversy or claim arising out of or relating to this insurance agreement or the breach, termination or invalidity thereof." *See* Aspen's Memorandum in Support of Motion to Stay, at 6 – 7 (quoting Declaration of Nicola Wood, ex. 10 (Endorsement 3) (docket no. 4)). In response, Fleet contends that not only is there no express

reference to arbitration in the Aspen Insurance Binder, but that no agreement to arbitrate was incorporated by reference. *See e.g.*, Fleet's Memorandum in Opposition to Motion to Stay, at 1. To a large extent (although not entirely) the outcome depends upon the proper interpretation of the term "follow form" in the insurance industry, and consequently, as used by the parties in the Aspen Insurance Binder. In the event the Court should find the parties agreed to arbitrate their disputes arising out of the Aspen Insurance Binder, Fleet further argues that Aspen waived its right to arbitration, expressly in communications with opposing counsel, and impliedly as a result of its conduct in this litigation. *See* Fleet's Opposition to Motion to Stay, at 10 – 12. Finally, the parties dispute whether litigation arising out of the Aspen Underwriting Binder, which indisputably does not contain an arbitration agreement, should also be stayed in the Court's discretion. *See* Aspen's Memorandum in Support of Motion to Stay, at 10; Fleet's Opposition to Motion to Stay, at 13.

The history of the pertinent contract negotiations and discussions between the parties in this case can be summarized as follows. On July 28, 2008, Fleet, using the services of Bowring Marsh (Dublin) Ltd. ("Marsh") as insurance broker, sent an email to Nicola Wood, a senior excess casualty underwriter of Aspen Insurance, seeking a quote for an excess insurance policy. *See* Declaration of Nicola Wood, at ¶¶ 2 – 4, and ex. 1 (docket no. 4). Several minutes later, Marsh sent another email to Ms. Wood with a subject line "Fw: Fleet – Swiss Re Quote," which stated that "[t]he attached is the Swiss Re quote which we would effectively like you to follow," and attached a document entitled "Fleet 2008 SwissRe Quote (25 xs 60)." *See* Declaration of Nicola Wood, at ¶ 5, and ex. 2 (docket no. 4). The attached Swiss Re quote included the following language:

| | |
|---|---|
| Applicable law; Court Jurisdiction & Arbitration | Applicable Law: New York<br>Court Jurisdiction: New York<br>Seat of Arbitration: London |
| [ . . . ] | |
| Other Terms Quoted | [ . . . ]<br>4. Arbitration Clause (attached) |

Swiss Re Quote to Fleet dated July 23, 2008, at 2 – 3 (docket no. 4, ex. 2) ("Swiss Re Quote").

While the Swiss Re Quote stated that the arbitration clause was attached, it does not appear that

Marsh forwarded the attachments to the Swiss Re Quote to Ms. Wood. However, Ms. Wood proffers

that she is, and was at the time, familiar with the Swiss Re arbitration clause, and further that she

expected on the basis of the Swiss Re quote that the followed Swiss Re policy would also

incorporate its arbitration clause. *See* Aspen's Reply Memorandum, at 3; Declaration of Nicola

Wood, at ¶¶ 5, 11. On July 30, 2008, Ms. Wood sent Marsh a quote for insurance for Fleet, which

stated under the caption "Followed Policy" the following terms:

> Quotation contemplates providing follow form claims made coverage
> of the Swiss Re policy wording which in turn follows the C.N.A.
> policy wording for products and the AIG policy wording for non-
> products, subject to the Aspen terms and conditions detailed below
> and receipt, review and agreement of underlying wordings.

Aspen Insurance Quote to Fleet dated July 30, 2008, at 2 (docket no. 4, ex. 3). Furthermore, in the

following section entitled, "Aspen Insurance UK Limited Policy and Terms and Conditions," was

the term that "Aspen Follow Form Jacket (01/08) to apply subject to the terms and conditions

below." *Id.* at 2. The "follow form jacket" is a blank version of certain standard terms and conditions

relating to following form in the excess insurance coverage context. *See* Aspen's Reply

Memorandum, at 4. It does not appear that the "follow form jacket" was attached to this quote.

On July 31, 2008, Aspen sent Marsh a second, revised quote for insurance for Fleet, along with draft policy wording, *i.e.*, a completed "follow-form jacket" and other additional terms and conditions. *See* Aspen Insurance Quote to Fleet dated July 31, 2008 (docket no. 36, ex. E). This second quote, in addition to providing the same language that the "Quotation contemplates providing follow form claims made coverage of the Swiss Re policy wording," also included the following term in its draft policy language.

> Item 13.   Insuring Agreement
>
> This policy shall provide the Insured with Excess Insurance coverage in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained in the Followed Policy(ies) set forth in Item 8 above and as attached on the inception date of this Policy, subject always to the premium, limits of liability, policy period, warranties, exclusions, limitations and other terms and conditions of this Policy including any and all endorsements attached hereto which may be inconsistent with the Followed Policy.

*See id.* at 4. In this term, Item 13 refers to the "Followed Policy(ies)" set forth in Item 8, and Item 8 specifically refers only to the Swiss Re policy. *See id.* at 2.

On July 31, 2008, Marsh requested that Aspen Insurance bind coverage and issue the binder as soon as possible. *See* Declaration of Nicola Wood, at ¶ 7, and ex. 4.

Later on July 31, 2008, Aspen issued the Binder as requested ("Aspen Insurance Binder"). *See* Declaration of Nicola Wood, at ¶ 7, and ex. 5. The Aspen Insurance Binder, as with the two prior quotes issued before it, also provided that it "contemplates providing follow form claims made coverage of the Swiss Re policy wording." *Id.*

Swiss Re also issued its Binder on July 31, 2008, which contained, *inter alia*, an arbitration clause providing that "[a]ny dispute, controversy or claim arising out of or relating to this insurance agreement or the breach, termination or invalidity thereof shall be finally and fully determined in

London, England under the provisions of the Arbitration Acts of 1950, 1975 and 1979 . . . ." *See* Declaration of Nicola Wood, at ¶ 8, and ex. 6.

The Aspen Insurance Binder was subsequently amended two times, on August 1, 2008, and then on August 14, 2008, and at least the second amendment was the result of changes requested by Marsh. *See* Declaration of Nicola Wood, at ¶¶ 9 – 10. Both amended versions of the Aspen Insurance Binder contained the same language that it "contemplates providing follow form claims made coverage of the Swiss Re policy wording." At no time did the parties discuss or object to this language, or the language contained in Item 13 of Aspen's circulated draft policy wording. As such, the distinctions between the original and amended versions of the Aspen Insurance Binder are immaterial for the purposes of the instant dispute. *See* Complaint, at ¶¶ 9 – 10 (stating that "[o]n August 1, 2008, Fleet entered into two insurance contracts with Aspen" and "issued to Fleet binders of insurance for the Aspen Policies," without referring to the subsequent amendments thereto).

The Swiss Re Policy ultimately issued contains the same arbitration clause as that circulated in the Swiss Re Binder dated July 31, 2008. *See* Declaration of Nicola Wood, at exs. 6 and 10.

Subsequent to the issuance of the Aspen Insurance and Aspen Underwriters Binders, Fleet paid Aspen premiums of $186,500.00 and $215,000.00 respectively. *See* Complaint, at ¶ 11. Fleet alleges that it "complied with all the requirements, terms and conditions of the Aspen Policies that may be inferred from the terms and conditions of the binders for the Aspen Policies." *See* Complaint, at ¶ 14. Specifically regarding potential liability for Phospho-soda products, Fleet alleges that it manufactured and distributed such products until December 11, 2008, and that Aspen was aware that Fleet was named as a defendant in multiple lawsuits arising from the ingestion of such products before and after it issued the Binders. *See* Complaint, at ¶¶ 15 – 17.

A dispute subsequently arose between the parties regarding whether Aspen was contractually obligated under the Binders to provide insurance coverage for Fleet, or conversely, whether Fleet had materially misrepresented its loss history and as a consequence, the Binders were *void ab initio*. *See e.g.*, Complaint, at ¶ 19; Defendant's Demurrer, Answer, Affirmative Defenses, Counterclaim, and Jury Demand, at ¶ 25. On August 18, 2009, Fleet filed its Complaint in state court, seeking a declaratory judgment that Aspen owed Fleet a duty of coverage. The parties corresponded several days after the Complaint was filed, and agreed that Fleet would temporarily delay service upon Aspen until October 26, 2009, to allow for the exchange of certain discovery materials requested by Aspen for its internal investigation into Fleet's loss history, and agreed that Aspen would waive formal service of process. *See* Fleet's Opposition to Motion to Stay, exs. B and C; Aspen's Reply Memoranda, exs. M, N, and O. In the interim, Aspen concluded its internal investigation, and believing Fleet to have materially understated its loss history, hand-delivered purported notices of rescission of the Binders upon Fleet on September 25, 2009. *See* Defendant's Demurrer, Answer, Affirmative Defenses, Counterclaim, and Jury Demand, at ¶ 29. On October 26, 2009, service was effectuated upon Aspen pursuant to the parties' prior agreement. On November 13, 2009, Aspen filed its responsive pleading in state court.

Shortly thereafter, Aspen removed the suit to this Court, moved this Court for a stay of litigation pending the completion of arbitration proceedings, and made an arbitration demand upon Fleet, all on November 24, 2009. Following the conclusion of briefing on the instant Motion to Stay, on January 15, 2010, the United States Judicial Panel on Multidistrict Litigation ("the Panel") issued a conditional transfer order ("CTO") regarding the potential transfer of this action and a related action involving Fleet and another insurer to the District Court for the Northern District of Ohio. The Court found it appropriate under the circumstances to await the Panel's ruling on the CTO prior to

the issuance of this decision. The parties concluded their briefing on the CTO on March 17, 2010. The Panel set the issue for hearing on May 27, 2010, and after hearing oral arguments, issued an order vacating the CTO on June 15, 2010. As a result, the Court retained jurisdiction over these actions.

## II. APPLICABLE LAW

The Federal Arbitration Act, 9 U.S.C. §§ 1 – 16 (2006) ("FAA") governs the rights and responsibilities of the parties to an arbitration agreement. *See Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d 340, 342 (4th Cir. 2009) (citing *Patten Grading & Paving, Inc. v. Skanska USA Building, Inc.*, 380 F.3d 200, 204 (4th Cir. 2004)). The FAA "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927 (1983).

Before the enactment of the FAA and until the early part of the twentieth century, American courts borrowed the historic hostility of the English courts toward enforcing arbitration agreements. *See Allied Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 270, 115 S.Ct. 834 (1995); *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 449-51 (4th Cir. 1997). However, the reasoning behind the courts' reluctance to enforce arbitration agreements gradually fell out of favor, and by 1925, Congress responded to the criticism with the enactment of the FAA. The specific purpose behind the FAA was to "place an arbitration agreement upon the same footing as other contracts and to overturn the judiciary's longstanding refusal to enforce agreements to arbitrate." *Glass*, 114 F.3d at 451; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647 (1991); *Koridze v. Fannie Mae Corp.*, 593 F.Supp.2d 863, 866 (E.D. Va. 2009). Consequently, the FAA reflects "a liberal federal policy favoring arbitration agreements," *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 301 (4th Cir. 2002) (quoting *Moses H. Cone*, 460

U.S. at 24, 103 S.Ct. 927), and reflects "a strong congressional preference for arbitration," *Qorvis Commc'ns, LLC v. Wilson*, 549 F.3d 303, 308 (4th Cir. 2008).

The FAA "envisions a limited role for courts asked to stay litigation and refer disputes to arbitration." *Rent-A-Center, West, Inc. v. Jackson*, --- U.S. ----, 130 S.Ct. 2772, 2782 (2010) (Stevens, J., dissenting); *see also Glass*, 114 F.3d at 453 (stating that the district court "engages in a limited review to ensure that the dispute is arbitrable"). Pursuant to 9 U.S.C. §§ 3, 4, when the Court finds that the parties "have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA *requires federal courts to stay judicial proceedings . . . and compel arbitration in accordance with the agreement's terms.*" *Murray*, 289 F.3d at 301 (emphasis added). Referral to arbitration is compelled by language in the FAA that "[t]he court 'shall' order arbitration 'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue.'" *Rent-A-Center*, 130 S.Ct. at 2776 (quoting 9 U.S.C. § 4) (majority opinion). The "stay-of-litigation" provision in the FAA is also "mandatory." *See Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002). Any doubts the Court may have regarding the scope of arbitrable issues should be resolved in favor of arbitration, "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273-74 (4th Cir. 1997) (quoting *Moses H. Cone*, 460 U.S. 24-25, 103 S.Ct. 927).

A party can compel arbitration if he establishes: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute." *Am. Gen. Life and Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005) (quoting *Adkins*, 303

F.3d at 500-01 (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991))). Fleet disputes the second factor, being the existence of a written agreement that includes an arbitration provision, in the Aspen Insurance Binder.

## III. Discussion

### A.

The first, and principal issue in dispute between the parties, concerns whether Fleet and Aspen Insurance are subject to a written arbitration agreement in the Aspen Insurance Binder. Upon consideration of the positions of the parties, the Court finds that the Aspen Insurance Binder provides for the arbitration of disputes, by virtue of the fact that it "follows form" to the Swiss Re policy, which itself contains an arbitration agreement.

Whether a party has agreed to arbitrate an issue is simply a matter of contract interpretation, *see Am. Recovery Corp.*, 96 F.3d at 92, and "[a]n insurance policy is to be read like any contract, and the words which it contains are to be given their ordinary meaning." *Highlands Ins. Co. v. Gerber Prods. Co.*, 702 F.Supp. 109, 112 (D. Md. 1988). Accordingly, the Court will look first to the plain language of the Aspen Insurance Binder, which is a "unique type of contract," that is, in effect, "a short method of issuing a temporary [insurance] policy for the convenience of all parties, to continue until the execution of the formal one." *World Trade Ctr. Prop., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 166 (2d Cir. 2003), *disagreed with by, on other grounds, Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). "While not all the terms of the insurance contract will be set forth in the binder, a binder is nevertheless a fully enforceable present contract of insurance." *Id.* at 167 (internal quotations omitted).

As recited in the facts above, after receiving a revised quote and draft policy language from Aspen, *see* Aspen Insurance Quote to Fleet dated July 31, 2008 (docket no. 36, ex. E), and after

discussing certain other terms in Aspen's draft policy language, Marsh stated: "Can you please Bind coverage effective 1.8.08 and issue Binder to me Asap," *see* Declaration of Nicola Wood, ex. 4. Following receipt of Marsh's request for Aspen to bind coverage, the Aspen Insurance Binder was issued later that day. This Binder provided that it "contemplates providing follow form claims made coverage of the Swiss Re policy wording which in turn follows the C.N.A. policy wording for products . . . subject to the Aspen terms and conditions detailed below" (docket no. 4, ex. 5). Furthermore, the draft policy wording that Aspen sent to Marsh along with its quote also contained, as one of its terms, the following:

> **Item 13**.        Insuring Agreement
>
> *This policy shall provide the Insured with Excess Insurance coverage in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained in the Followed Policy(ies) set forth in Item 8 above* and as attached on the inception date of this Policy, subject always to the premium, limits of liability, policy period, warranties, exclusions, limitations and other terms and conditions of this Policy including any and all endorsements attached hereto which may be inconsistent with the Followed Policy.

*See* docket no. 36, ex. E (emphasis added). Reference to Item 8 in the draft policy wording sent to Marsh provides that the "Followed Policy" is that issued by Swiss Re. *See id.* Therefore, the plain language contained in the Binder clearly provides that it was to "follow form" of the Swiss Re policy wording, which, as clarified in Item 13, provided that the coverage by Aspen Insurance would be "in accordance with the same warranties, terms, conditions, exclusions, and limitations" as those contained in the Swiss Re policy. The Court notes that the Aspen Insurance Binder was subsequently amended at least two times, and that at no point was the aforementioned language changed or objected to. On this basis alone and apart from the contested interpretation of the insurance industry term "follow form," the coverage to be provided under the Aspen Insurance Binder included the same *terms* as the Swiss Re policy, except where such terms would conflict. The arbitration

agreement was a term of the underlying Swiss Re policy, and specifically a term about which Fleet and Aspen were on notice, and had access to, *before* the issuance of the Aspen Insurance Binder. Therefore, by the express terms of the Aspen Insurance Binder and in the absence of any conflicting language contained therein (of which there is none), the Swiss Re arbitration agreement was also made a term of the Aspen Insurance Binder. However, it is not required that the Court so conclude on this basis alone.

The parties advance different constructions of the term "follow form," and dispute whether an excess insurer, such as Aspen Insurance, that "follows form" of the underlying insurer's policy language, such as that of Swiss Re, would consequently follow an arbitration agreement contained in said underlying insurance policy. First, the Court finds that the weight of authority within the Fourth Circuit supports the proposition that the policy of an excess insurer that "follows form" of the underlying insurer's policy language would incorporate the terms, conditions and coverage contained therein, except to the extent there is a conflict. *See e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Porter Hayden Co.*, 331 B.R. 652, 657 n.6 (D. Md. 2005) ("A policy that 'follows form' has the same terms and conditions of another policy, typically the policy insuring the insured in the level of coverage directly below that of the insurer following form."); *Perdue Farms Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 197 F.Supp.2d 370, 374 n.7 (D. Md. 2002) ("Federal's is a 'follow form' policy, meaning that it provides precisely the same coverage as National's."). The Court finds further support for this interpretation of "follow form" in many other jurisdictions and in treatises on insurance. *See e.g., Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 322 (3d Cir. 2005) ("This excess policy was, by its terms, 'follow-form, claims-made' coverage, meaning that   the Lexington policy incorporated the terms and conditions of the primary PHICO policy for medical malpractice claims."); *Pentair Water Treatment (OH) Co. v. Cont. Ins. Co.*, No.

08 Civ. 3604, 2009 WL 1119409, at *4 (S.D.N.Y. Apr. 26, 2009) (quoting *In re Liquidation of Midland Ins. Co.*, 861 N.Y.S.2d 922, 927 n.5 (Sup. Ct. 2008) (quoting 23-145 Appleman on Insurance § 145.1)) (noting that a "follow form" excess policy "incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy").

In fact, it is "well settled that the obligations of following form excess insurers are defined by the language of the underlying polices, except to the extent that there is a conflict between the two policies, in which case the wording of the excess policy will control." 2 Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 13.01 at 868 (12th ed. 2004). Fleet has not identified any such conflict between the terms of the Aspen Insurance Binder, and the "followed" underlying policy, relating to the agreed-upon method of dispute resolution.

More importantly, those courts that have considered the specific question posed here, which is whether an arbitration agreement in an underlying insurance policy would be incorporated into an excess "follow form" policy, appear to reach the conclusion that an arbitration agreement would be incorporated. *See Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 589 (7th Cir. 2001) (recognizing that "[a] follow-form policy must have a form, which is to say that form's terms, to follow," and specifically holding that "a follow-form reinsurance agreement logically includes an arbitration agreement in the underlying contract"); *Boeing Co. v. Agricultural Ins. Co.*, No. C05-921C, 2005 WL 2276770, at *7 (W.D. Wash. Sept. 19, 2005) (stating that "both AIG and Gulf constructed their policies to 'follow form' on Federal's policy, so that each know of and expressly incorporated the arbitration provision in Federal's policy"); *Radil v. Nat'l Union Fire Ins. Co. of Pittsburg, P.A.*,233 P.3d 688, 692 (Colo. 2010) (en banc) ("Accordingly, we determine that National Union's follow-form endorsement subjects it to the arbitration clause contained in Great American's UM/UIM [underlying policy] coverage."). The Court notes that Fleet has raised some concern with

the timing of the issuance of the underlying Swiss Re Policy, arguing that Aspen could not have in its Binder, incorporated the terms of the Swiss Re Policy and bound Fleet to them when the Policy had not yet been issued. *See* Fleet's Opposition to Motion to Stay, at 7 (arguing that, as in the *World Trade Center* case, the "follow form" language "does not permit [Aspen] to incorporate *all* the terms and provisions of the Swiss Re policy that was issued months after the Aspen binder was issued"). While such a concern might be warranted in other circumstances, here, both Fleet and Aspen were made expressly aware before the Aspen Insurance Binder was issued that the Swiss Re policy would have included therein an arbitration agreement. *See* Swiss Re Quote to Fleet dated July 23, 2008, at 2 – 3 (docket no. 4, ex. 2). Furthermore, the same day the Aspen Insurance Binder was issued, the Swiss Re Binder was also issued, including the same arbitration that was ultimately included in the Swiss Re Policy. *See* Declaration of Nicola Wood, at ¶ 8, and ex. 6. Finally, the Court notes that in the subsequent discussions between Fleet and Aspen relating to the Aspen Insurance Binder, suggested amendments were made thereto and at no point was the "follow form" language identified as a possible issue.

Fleet and Aspen therefore unambiguously agreed to arbitrate "any dispute, controversy or claim arising out of or relating to" the Aspen Insurance Binder. However, even if the Court had doubts on the issue, it would likewise be required to stay the litigation in favor of arbitration. *See e.g.*, *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273-74 (4th Cir. 1997). The Court also finds it clearly established and undisputed that the disputes between the parties fall within the broad scope of said arbitration agreement. Accordingly, the Court will stay litigation as to Fleet and Aspen Insurance, pending the conclusion of arbitration proceedings, subject to the Court's following holding as to "waiver."

B.

Although the Court has found that the Aspen Insurance Binder provides for arbitration of disputes between the parties, that is not the end of the Court's inquiry. It must next address Fleet's argument that Aspen has expressly and impliedly waived its right to arbitration.

An applicant seeking a stay of litigation in favor of arbitration is only entitled to such relief "provid[ed] the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. The principle of "default" as found in the FAA is "akin to waiver," however, "the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly inferred." *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985) (citing *In re Mercury Constr. Co.*, 656 F.2d 933, 939 (4th Cir. 1981), *aff'd*, 460 U.S. 1, 103 S.Ct. 927 (1983)). In light of the federal policy favoring arbitration, the general rule is that "a party will default its right to arbitration if it 'so substantially utiliz[es] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay.'" *Forrester v. Penn Lyon Homes, Inc.*, 553 F.3d 340, 343 (4th Cir. 2009) (quoting *Maxum Founds.*, 779 F.2d at 981). Specifically, courts have found that "simply failing to assert arbitration as an affirmative defense does not constitute default of a right to arbitration," and that "delay and participation in litigation will not alone constitute default." *Forrester*, 553 F.3d at 343 (citing cases). In sum the Court must be mindful that the "heavy burden" of proving default "lies with the party opposing arbitration." *Forrester*, 553 F.3d at 343 (citing *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 96 (4th Cir. 1996)).

Fleet first argues that Aspen expressly waived its right to arbitration. The lynchpin of this argument is a letter from defense counsel, Kurt Hirsch, to plaintiff's counsel, Lon Berk, dated

August 21, 2009 (three days after the filing of the Complaint). In particular, Fleet cites the following language in the letter as supporting its argument of express waiver:

> While, in fact, no race existed, Fleet has won the proverbial race to the courthouse. Having thus succeeded, will Fleet now provide Aspen with the remaining material requested for our investigation [into the alleged inaccuracy of representations made by Fleet in procuring insurance coverage] and allow that investigation to be completed? We can then communicate regarding the results and, if appropriate, explore whether there is a basis to resolve any differences. If Fleet thereafter remains dissatisfied, it can then serve the Complaint and *litigation can commence*. But doesn't some pre-*litigation* communication make sense at this juncture?

Fleet's Opposition to Motion to Stay, ex. B (docket no. 35) (emphasis added by Fleet). Fleet summarily argues that the representations Aspen made in this letter "that the parties would litigate their dispute" amount to "an express waiver of any alleged right to arbitrate." Fleet's Opposition to Motion to Stay, at 11. Even if the Court should find that Aspen's actions did not amount to an express waiver of arbitration, Fleet alleges that "Aspen's conduct throughout the course of this dispute indicates an implicit waiver amounting to default of the right to arbitrate." *Id.* Fleet then makes two arguments as to how Aspen implicitly waived its right to arbitrate. First, during the period when Fleet and Aspen had agreed that service of the Complaint would be postponed in the interest of "narrowing the dispute," Fleet argues that Aspen undertook several actions inconsistent with its intention to arbitrate, namely by attempting to rescind the insurance contracts with Fleet, and by filing Defendants' Demurrer, Answer, Affirmative Defenses, Counterclaim, and Jury Demand. *See* Fleet's Opposition to Motion to Stay, at 11 – 12. Second, Fleet argues that Aspen prejudiced Fleet by failing to timely demand arbitration, because Aspen had already "obtained the full resources of judicial discovery, while preventing Fleet from obtaining any discovery." *Id.* at 12.

In response, Aspen emphasizes the high threshold that Fleet would have to overcome to establish that Aspen had waived its right to arbitration. *See* Aspen's Memorandum in Support of

Motion to Stay, at 8. Turning to the specific alleged circumstances constituting waiver, Aspen argues that rather than expressly *waiving* arbitration, it instead had expressly *reserved* its right to arbitrate. *See id.* at 9 – 10. Aspen argues that it rejected opposing counsel's suggestion to agree "that its dispute with Fleet will be addressed in the action already commenced." *See* Aspen's Reply Memorandum, ex. M (docket no. 36). Aspen did write that it "will not take advantage of this [agreed-upon] pause in serving the Complaint [until October 26, 2009 or later] by filing a competing action prior to such service," and that "[t]o be clear, Aspen has no present intent of filing a new suit. But there is no good reason for Aspen to limit its future options more than this in return for a brief, mutually beneficial timeframe for our investigation to conclude and us to communicate regarding the results thereof and narrowing the dispute. Aspen's commitment that Fleet's lawsuit will maintain its first-filed status should be sufficient." *See* Aspen's Reply Memorandum, ex. N (docket no. 36). Regarding Fleet's argument that Aspen's filing its responsive pleading, demurrer and counterclaim in state court constituted implicit waiver, it is noted that its responsive pleading was filed a mere ten days before Aspen's demand for arbitration, and further, that Aspen has specifically raised therein an affirmative defense that the dispute was subject to binding arbitration. *See* Aspen's Reply Memorandum, at 10. Finally, regarding Fleet's contention that Aspen had utilized litigation machinery and "obtained the full resources of judicial discovery," Aspen argues that there has been no merits discovery, and the discovery has been limited to whether a valid and binding arbitration agreement exists between the parties. *See id.*

The Court finds that Fleet, as the party opposing arbitration, has not met its "heavy burden" of showing default, *see Forrester*, 553 F.3d at 343 (citing *Am. Recovery Corp.*, 96 F.3d at 95), on the basis of either express or implied waiver. Aspen simply did not waive its previously-established right to arbitrate.

Any reasonable interpretation of Aspen's statement that "[i]f Fleet thereafter remains dissatisfied, it can then serve the Complaint and litigation can commence," in full context, is merely a suggestion that the parties voluntarily cooperate, at least temporarily, to narrow or otherwise resolve their disputes, rather than a binding commitment by Aspen to resolve its disputes in litigation to the exclusion of arbitration. Further bolstering this reading of Aspen's letter is the sentence immediately following, in which Aspen concludes, "[b]ut doesn't some pre-litigation communication make sense at this juncture?" However, even if there were any ambiguity in this statement, (and the Court finds none) it is clarified in light of the August 28, 2009 email, in which Aspen stated that "there is no good reason for Aspen to limit its future options more than this in return for a brief, mutually beneficial timeframe for our investigation to conclude." This language, in the context of the parties' communications, is consistent with an express reservation of Aspen's right to arbitrate, rather than an express waiver thereof. Furthermore, when courts determine whether statements such as those made by Aspen constitute an express waiver of a party's right to arbitrate, they have considered the timing in which the statements were made, as well as the parties' underlying purposes. *See e.g. Highlands Welmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 572-74 (6th Cir. 2003) (holding a party's statement that "we do not at this point agree to arbitration or other alternative dispute resolution" was not a waiver of right to arbitrate, considering, *inter alia*, the parties were "in a discussion stage about their respective claims and their positions" in the context of "pre-commencement negotiations"); *Enviro Petroleum Inc. v. Kondur Petroleum, S.A..*, 91 F.Supp.2d 1031, 1034 (S.D. Tex. 2000) (holding that the defendants' conduct did not amount to express waiver, largely because "this case involves *pre-commencement* conduct on the part of Defendants which . . . amounts to nothing more than bluster or an attempt to 'stare down' Enviro in the hopes the Enviro will simply give up"). While the Court finds the language used by

– 19 –

Aspen was clear and unambiguous in that it *did not* constitute a waiver of its right to arbitrate, further consideration of the timing of its statements (three days after Fleet filed its Complaint) as well as the purposes underlying its statements (to open a line of "pre-litigation communication" between the parties and to delay service for two months to determine if issues in the issues in dispute could be resolved or narrowed), lends further support in this regard.

Neither has Fleet met its burden in order to establish that Aspen's conduct constituted an *implicit* waiver of its right to arbitrate. First, the Court finds that Aspen did not act in a dilatory fashion in pressing for arbitration. A relatively small period of time elapsed between the date of the filing of the Complaint (August 18, 2009) and the date upon which Aspen made its demand for arbitration, and filed the instant Motion to Stay (November 24, 2009). *See* Motion to Stay (docket no. 2); Aspen's Memorandum in Support of Motion to Stay, ex. A (docket no. 3). All other things being equal, a three month period of delay from the commencement of litigation and the party's demand for arbitration does not rise to the level of waiver. *See Patten Grading & Paving, Inc*, 380 F.3d at 205-06 (finding no prejudice by the defendant's four month delay in moving for arbitration); *Maxum Founds.*, 779 F.2d at 982 (finding no prejudice in a delay of three months); *see also Coca-Cola Bottling Co. v. Soft Drink and Brewery Workers Union Local 812*, 242 F.3d 52, 57 (2d Cir. 2001) (finding no waiver of arbitration by defendant's "failing for four months to press its arbitration claim"); *Jung v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F.Supp.2d 211, 217 (S.D.N.Y. 2006) (finding no waiver of arbitration by defendant's "waiting approximately six-and-a-half months after the start of litigation before moving to compel arbitration"). Fleet has not cited to any authority or substantiated any arguments as to why Aspen's delay in seeking arbitration should be considered to have caused Fleet prejudice.

Second, the Court must look beyond just the timing of Aspen's demand for arbitration, and must also consider the extent to which Aspen participated in, and utilized, the litigation process before moving for arbitration. *See Forrester*, 553 F.3d at 343. The Court finds that Aspen made minimal use of the "litigation machinery," such that it did not rise to the level of implicit waiver. Fleet correctly notes that Aspen filed a responsive pleading in state court which raised several grounds in its demurrer, many affirmative defenses, as well as a counterclaim. However, the filing of such a responsive pleading does not necessarily amount to implicit waiver of one's right to arbitrate. *See Patten Grading & Paving, Inc*, 380 F.3d at 206 (noting that "we have previously held that a party's filing of minimal responsive pleadings, such as an answer or compulsory counter-claim, are not necessarily inconsistent with an intent to pursue arbitration"); *see also Coca-Cola Bottling Co.*, 242 F.3d at 57 (finding defendant had not waived right to arbitration by "answering Coca-Cola's complaint, claiming a violation of the TRO, entering into a protective order and stipulation for discovery"). Further, Aspen cannot be considered to have fully "submitted" the case for decision to the state court on the issues contained in its responsive pleading, as suggested by Fleet, *see* Fleet's Opposition to Motion to Stay, at 12, because Aspen removed the case to this Court ten days thereafter, and simultaneously moved for a stay of litigation pending the outcome in arbitration. It appears clear, from the course of Aspen's conduct in this case, that it never sought to have the substance of this dispute resolved in state or federal court.

Finally, Fleet argues that it was prejudiced because "Aspen obtained the full resources of judicial discovery, while preventing Fleet from obtaining any discovery." The Court finds this assertion also to be without merit. The information received by Aspen pursuant to its "pre-litigation" investigation was not the result of Aspen's utilization of the litigation machinery, but instead was the result of an ultimately unsuccessful attempt by the parties to resolve their dispute without litigation.

The Court further notes that it is uncontested that the discovery taken in this proceeding has limited to the narrow issue before the Court, *i.e.*, concerning the existence of an arbitration agreement between the parties. Fleet argues that it was specifically prejudiced due to this discovery because, were it not for Aspen's alleged promise of "narrowing the dispute," "Fleet would have been able to challenge Aspen's contention that there was an arbitration agreement, or have simultaneous discovery in an arbitration proceeding, thereby having the merits of the dispute resolved months before." With regard to the first point, the Court notes that Fleet has taken advantage of the opportunity to contest the existence of an arbitration agreement in this proceeding. *See* Fleet's Memorandum in Opposition to Motion to Stay, at 6 – 10. With regard to the second point, the Court has previously determined that the three-month delay before Aspen moved for arbitration did not, all other things being equal, constitute prejudice to Fleet. No argument has been articulated and substantiated to differentiate the instant case from those previously cited.

Accordingly, the Court finds that Fleet has not met its "heavy burden" of showing either that Aspen's statements, or its conduct in the litigation, amount to either explicit or implicit waiver of its right to arbitration. Therefore, the Court will stay litigation between Fleet and Aspen Insurance.

## C.

The final issue is whether the Court, after staying litigation on the disputed claims between Fleet and Aspen Insurance, should also stay the claims between Fleet and Aspen Underwriting. The decision to stay litigation of non-arbitrable claims or issues pending the resolution of related arbitration proceedings "is a matter largely within the district court's discretion to control its docket." *Am. Recovery Corp.*, 96 F.3d at 97. When there are questions of fact common to all claims that are likely to be settled during arbitration, "considerations of judicial economy and avoidance of confusion and possible inconsistent results" may suggest that all proceedings should be stayed until

the arbitration is completed. *Am. Home Assurance Co. v. Vecco Concrete Constr. Co., Inc. of Va.*, 629 F.2d 961, 964 (4th Cir. 1980).

In this case, the arbitrable and non-arbitrable claims share common questions of fact. At a minimum, the arbitrator will have to determine whether the loss history provided by Fleet understated Fleet's actual loss history, and these facts will likely affect the resolution of the claims reserved for judicial adjudication. *See e.g.*, *DataNational, Inc. v. Yellow Book Sales & Distribution Co., Inc.*, No. 3:05-cv-00035, 2005 WL 3499929, at *3 (W.D. Va. Dec. 21, 2005) (staying claims that arose from the same factual allegations as the claims compelled to arbitration); *Hikers Indus., Inc. v. William Stewart Indus. (Far East) Ltd.*, 640 F.Supp. 175, 178 (S.D.N.Y. 1986) ("Many federal courts have granted stays as to entire actions in which arbitrations involving less than all defendants are likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). That the dispute between Fleet and Aspen Underwriting arises from the same or similar questions of fact as Fleet and Aspen Insurance is further evidenced by Fleet's own recitation of the pertinent facts in the Complaint itself. *See e.g.*, Complaint, at ¶ 14 ("Fleet has complied with all the requirements, terms and conditions of *the Aspen Policies*" (emphasis added)), and ¶ 17 ("Aspen was aware that Fleet had been so-named [as defendant in multiple lawsuits arising out of alleged ingestions of Fleet's Phospho-Soda products], and was aware that Fleet intended to acquire insurance from Aspen that was to cover, among other things, claims made against Fleet during Aspen's policies' periods allegedly as a result of Phospho-Soda products sold in the United States").

Noting the arbitrable and non-arbitrable claims share a considerable number of common questions of fact, the Court, in its discretion and in the interests of avoiding confusion and possible inconsistent results, will stay the remaining claims until the arbitration has ended. However, counsel

may petition the Court at any time to end the stay, if the party is threatened with irreparable harm resulting from said stay.

## IV. CONCLUSION

Therefore, after full consideration of the arguments set forth therein and presented at the hearing, for the reasons set forth in this Memorandum Opinion, the Court granted Aspen's Motion to Stay Proceedings Pending Arbitration, as to Aspen Insurance and Aspen Underwriting, in an Order dated September 30, 2010 (docket no. 42).

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this _15th_ day of October, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE